IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 2, 2005 Session

JERRY D. CARMACK, ET AL. v. TINA M. EARP, ET AL.

A Direct Appeal from the Chancery Court for Sumner County
No. 2001C-174     The Honorable Tom E. Gray, Chancellor

No. M2003-03100-COA-R3-CV - Filed April 27, 2005

Property owners filed suit against neighbors for trespass. Trial court entered judgment for plaintiffs in the amount of $13,740, applying the "mild rule" for calculation of damages for trespass. Trial court also made rulings establishing the boundary lines between property of plaintiffs and defendants, and confirmed the plaintiffs' continuing right of ingress and egress through defendant's property to their own property. On appeal, plaintiffs contend that trial court erred in failing to award damages based on "harsh rule" rather than mild rule; in failing to find that the boundary lines were in keeping with plaintiffs' expert's survey; and in granting summary judgment to defendant water utility district. We conclude that the trial court erred in granting summary judgment to the water utility district. In all other respects, we affirm.

Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Vacated in Part, and Remanded

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

August C. Winter of Brentwood for Appellants, Jerry D. Carmack, Georgia Kay Carmack Brooks, and Brenda Gail Carmack Thomas

Brce N. Oldham of Gallatin for Appellees, Tina M. Earp, Individually and as Executrix of the Estate of Kenneth H. Earp; Kenneth H. Earp Revocable Living Trust, Tina M. Earp, Elizabeth J. Hammond and Charles E. Duck, III, Trustees; and Tina M. Earp Revocable Living Trust, Tina M.Earp, Trustee

William L. Moore, Jr., of Gallatin for Appellee, Phillip Alexander

OPINION

I. PROCEDURAL HISTORY

This is a  trespass and inverse condemnation case. Appellants, Jerry D. Carmack, Georgia Kay Carmack Brooks, and Brenda Gail Carmack Thomas ("the Carmacks"), sued their neighbors to the south ("the Earps") and their neighbor to the west, Phillip Alexander.[1] Appellants also sued various governmental entities that allegedly encroached upon Appellants' property at its southeastern boundary in connection with the McKee Farms Estate subdivision. Several purchasers of subdivision lots, which allegedly encroached upon Appellants' property, were also named as defendants.

Appellants' claims against the subdivision lot purchasers were resolved prior to trial. All of the claims against governmental entities were dismissed on summary judgment on statute of limitations grounds. The case proceeded to trial before the Honorable Tom E. Gray, Chancellor, without a jury. The court found the Earps to have trespassed upon Appellants' property to strip topsoil and remove creek gravel, and Appellants were awarded a judgment against the Earps in the amount of $13,740. The judgment also established the Appellants' boundary lines with the Earps, with the McKee Farms Estate subdivision, and with the defendant Alexander. The trial court also confirmed Appellants' right to ingress and egress from Rock Springs Road onto their property.

The trial court entered judgment in this case on August 19, 2003. The Carmacks' Motion to Alter or Amend this judgment was filed on September 18, 2003, and was denied by an order entered on November 13, 2003. Appellants timely filed their notice of appeal on December 9, 2003, seeking to recover damages from the Earps under the "harsh" rather than "mild" rule; to have boundary lines established in keeping with their expert's survey; and to set aside the summary judgments granted to Castalian Springs-Bethpage Water Utility District and North Central Telephone Cooperative.

Following the filing of their Notice of Appeal, the Appellants settled their claims against North Central Telephone Cooperative, and the parties submitted a joint motion to dismiss North Central Telephone Cooperative on May 26, 2004.

## II. FACTS

This is an appeal from the trial court's judgment in a boundary dispute case regarding farmland in Sumner County, Tennessee.[2] Around Thanksgiving of 1998, when the Carmacks became aware of the activities giving rise to this lawsuit, they were not in possession of the farmland at issue here, but held a remainder interest subject to a life estate held by the Alexander family; the property

---

[1]     The use of the name "Alexander" in this opinion is accompanied by some potential for confusion, since the Carmacks' neighbor to the west (and Appellee) is Phillip Alexander, and the Carmack property was in the possession of the Alexander family (relatives of Phillip Alexander) until 2000 due to a life estate held by the Alexanders. Therefore, when we refer to "the Alexanders" in this opinion, we are referring to the former holders of the life estate in the Carmack property. When we refer to "Mr. Alexander," "Phillip Alexander," or "the Alexander property," we are referring to the owner of the property adjoining the west boundary of the Carmack property.

[2]     The property at issue in this appeal was the subject of an earlier appeal heard by this court, *Gregory v. Alexander*, 367 S.W.2d 292 (Tenn. Ct. App. 1962). In *Gregory v. Alexander*, this Court held that the Appellants in the case at bar—Jerry D. Carmack, Georgia Kay Carmack Brooks, and Brenda Gail Carmack Thomas, who were minors at the time—held a remainder interest in the property at issue here.

was conveyed back to the Carmacks by the Alexanders in September 2000. Based on their observations during the 1998 Thanksgiving holiday, the Carmacks believed that encroachments had been made onto their property from the south as a result of the construction of a residential development on adjacent property owned by their neighbor, Ken Earp. The alleged encroachments included the removal of a fence along their property, the placement of survey stakes, and the potential obstruction of a long-standing access point onto their property from Rock Springs Road. The Carmacks took measurements and contacted Ken Earp to discuss their concern that his construction activities constituted an encroachment upon their property. Although the parties discussed the possibility of the Carmacks purchasing one of Mr. Earp's lots ("Lot 25") that was directly adjacent to their property, no such agreement was reached. Mr. Earp continued his construction activities and, according to the Carmacks, rebuffed their attempts to discuss the matter further with him. Sometime in April, 1999, Jerry Carmack met with Mr. Earp's surveyor, Carroll Carman, at Mr. Carman's home. Mr. Carmack and Mr. Carman compared their surveys with the deeds for the property, and they found three principal areas of disagreement: one concerning a triangular portion at the southwestern edge of the Carmack property, another concerning a railroad right of way, and the third concerning ownership of the subdivision frontage on Rock Springs Road. In testimony at trial, Mr. Carmack and Mr. Carman gave different accounts of how the meeting was concluded; although the meeting seems to have begun in a cordial and cooperative spirit, Mr. Carman testified that the mood changed and Mr. Carmack attempted to intimidate him into changing the boundary line in his survey of the Earp property. Mr. Carman testified that he was forced to escort Mr. Carmack out of his home, a charge that Mr. Carmack denies. The men did not reach an agreement concerning the property boundaries at that meeting. Mr. Carmack subsequently filed a complaint against Mr. Carman with the Tennessee Land Surveyors Board.

The day after the contentious meeting between Mr. Carmack and Mr. Carman, the Carmacks hired Dewayne Caldwell, a licensed engineer and surveyor, to conduct their own boundary survey. On April 23, 1999, the Carmacks' attorney sent Ken Earp and his wife, Tina Earp, a certified letter giving them notice that some of the subdivision property under development might contain property owned by the Carmacks; that the Earps' excavation activities were encroaching upon the Carmacks' property; that Bledsoe Creek, where the Earps were conducting dredging activity, is a navigable waterway; and that the Earps' excavation activities were destroying existing boundary markers which might be needed to determine proper boundary locations.

The Earps did not respond to the Carmacks' letter, but continued to excavate on the contested piece of property. The Earps also engaged a company to harvest topsoil from a triangular piece of land that was in the area of contested boundary, and to harvest creek gravel from a section of Bledsoe Creek that the Carmacks contend is their property. Carmack testified that he had two confrontations with Mr. Earp, one in the offices of the Webster trucking and excavation company, and another at the site of the excavation. At the Webster offices, Carmack testified that Earp told him that "he was tired of being harrassed about the property, the boundaries, and that he bought the property to make money on and he was going to make money on the property ...." Mr. Carmack testified that the confrontation at the excavation site began while Mr. Carmack was taking photographs of the excavation, with Mr. Earp driving toward Mr. Carmack's truck at a high rate of speed as if he was

going to ram it. Mr. Earp spoke to Mr. Carmack and denied that he had recognized him. No resolution was reached at these meetings.

The Carmacks filed suit against the Earps; against their neighbor to the west, Phillip Alexander; against purchasers of subdivision lots in McKee Farms Estates (the subdivision developed by the Earps); and against several governmental entities. The claims against the subdivision lot purchasers were resolved prior to trial. The trial court granted summary judgment in favor of the governmental entities on statute of limitations grounds.

Three principal issues were disputed at trial. One was the boundary between the Carmack and Earp properties along Rock Springs Road; a second issue was the boundary between the Carmack and Earp properties at the far southern end of the Carmack property; and a third was the western boundary between the Carmack and Alexander properties. The parties introduced extensive proof at trial. The Carmacks called as witnesses their surveyor, Dewayne Caldwell; Erwin McKee, a 68-year-old resident of the area who had lived near the disputed property for all but five years of his life; Roger Leath, a 71-year-old resident of the area who have lived near the disputed property for all but sixteen years of his life; Jonathan Gray, a former employee of Ken Earp who hauled creek gravel from the disputed property; Bill Webster, who worked in trucking and excavating and did excavation for Ken Earp on the disputed property; and Scotty Parker, the Sumner County Road Superintendent. Jerry Carmack and Brenda Carmack Thomas testified on their own behalf. Phillip Alexander testified on his own behalf, and called Glenn Carter, a 69-year-old man who had worked on the disputed property in his youth. The Earps called Carroll Carman, their surveyor.[3]

The most crucial testimony at trial was the testimony of the surveyors for the Carmacks and the Earps, and we will summarize the surveyors' testimony here in some detail. The Carmacks's surveyor, Mr. Caldwell, testified about his usual practice in surveying property, as well as about his procedure in surveying the Carmacks' property. Mr. Caldwell testified that, in surveying the Carmacks' property, he referred to a variety of documents, some from as far back as the nineteenth century, including the Carmacks' deeds, the deeds to adjoining properties, the 1962 trial court order at issue in the *Gregory v. Alexander* case, and a U.S. Geological Survey topographical map. Drawing upon these sources for guidance, Mr. Caldwell then attempted to reconcile what was in the deed to the Carmacks' property with the landmarks his two-person surveying crew found on the ground. He concluded that there was a 62-foot "error of closure" in the deed to the Carmack farm. Mr. Caldwell did an unusually thorough job in surveying the Carmack property, he explained, because the Carmacks insisted that he go in greater depth than he usually would. Mr. Caldwell testified that the line he prepared in the survey, extending from the northeast corner to the southeast corner of the property, matched the surveys of adjoining properties by four or five inches, which he considered to be within the range of acceptable surveying technique. Mr. Caldwell explained that he encountered difficulty in establishing the place where the boundary of the Carmack farm crossed Rock Springs Road. Part of this difficulty was accounted for, Mr. Caldwell suggested, by the fact that Rock Springs Road had moved at some point during the past several decades (a claim denied

---

[3] Ken Earp was deceased by the time of trial.

by the appellees). By locating remnants of old pavement, Mr. Caldwell contended, he was able to locate the position of the old Rock Springs Road and thus find the correct point where the boundary crossed Rock Springs Road. Concerning the southern boundary of the Carmack property, a contested landmark was "twin sycamores" called for in the 1899 deed to the Carmack farm. Mr. Caldwell testified that his ground crew had located twin sycamores when they were surveying the Carmack property, but conceded on cross-examination that they could not be the same sycamores called for in the 1899 deed. With respect to the western boundary, Mr. Caldwell contended that the western boundary was in, and to the west of, Bledsoe Creek, while the defendants claimed that the boundary ran along the fence line. (The significance of the fence along Bledsoe Creek was disputed at trial; Phillip Alexander contended the boundary between his and the Carmack properties ran along the fence.) Mr. Caldwell also testified concerning his inclusion, within the Carmack boundaries, of a portion of a railroad right of way that conveyed back to the original property owners. In Mr. Caldwell's survey of the Carmack property, it appears that part of the railroad right of way owned by the Carmacks juts into the Earp property.

Appellees called the Earps' surveyor, Carroll Carman, to testify at trial. Mr. Carman testified that he is a registered land surveyor who had been practicing for 26 years. Mr. Carman had surveyed three properties adjoining the Carmack property: the Barnes property to the east; the Earp property, to the south; and the Phillip Alexander property, to the west. Mr. Carman's procedure in surveying a property was similar to that of Mr. Caldwell; he testified that he first went to the courthouse and obtained "all the records we can find that bear upon the survey boundaries." As did Mr. Caldwell, Mr. Carman concluded that there was a mathematical error of closure in the deed to the Carmack property. However, Mr. Carman differed from Mr. Caldwell in his view of the appropriate way for a surveyor to deal with the mathematical error. For example, he stated that Mr. Caldwell made an "amazingly arbitrary" addition of 104 feet to the survey in order to establish a boundary between the Carmack and Earp properties, when in fact the survey should reflect a boundary running along a southern fence line (a short distance north of a line that Mr. Caldwell suggested was the boundary between the Carmack and Earp properties). He summed up by pointing out three "glaring" inconsistencies in Caldwell's survey:

> ... Mr. Caldwell added 67 and a half feet to match the center of the creek; added over 100 feet to come to a twin sycamore he picked out on the west bank; added 49 feet to enlarge this supposed encroachment across Rock Springs Road, and created this mathematical manipulation.

Mr. Carman further contested Mr. Caldwell's claim that Rock Springs Road had moved. He contended that there was no evidence that Rock Springs Road was ever located in a different place than its position at the time of trial. Mr. Earp also testified that, in his professional judgment, the tip of the railroad right of way belonging to the Carmack property should not extend as far south as Mr. Caldwell suggested.

## III. ISSUES

Appellants present the following issues on appeal:
1. Whether the trial court erred in awarding the plaintiff landowners damages only under the mild rule, instead of the harsh rule, where the defendants maliciously trespassed upon the plaintiffs' property to remove topsoil and creek gravel with full knowledge of the plaintiffs' claims.

2. Whether the trial court erred in failing to apply the plaintiffs' expert's survey to establish (a) the plaintiffs' ownership interest in a railroad right of way acquired by deed; (b) the plaintiffs' western boundary line; and (c) the plaintiffs' southeastern boundary line along Rock Springs Road.

3. Whether the trial court erred in granting the defendant Castilian Springs-Bethpage Water Utility District of Sumner County [Summary Judgment] where the plaintiff had raised by affidavit genuine issues of material fact.

Appellees Tina M. Earp, the Kenneth H. Earp Revocable Living Trust, and the Tina M. Earp Revocable Living Trust present the following issues for review:

4. Did the trial court err in failing to determine that the fence line was the correct southern boundary between the Carmack Property and the Earp Property, and if so, should the judgment against Defendant Earp for monetary damages and discretionary costs be vacated?

5. Whether the trial court erred by ordering Defendant Earp to restore the Plaintiffs' access to their property from Rock Springs Road in the absence of any proof that the Defendant had prevented such access?

## IV. STANDARD OF REVIEW

Our standard of review in this non-jury case is de novo upon the record of the proceedings below and there is no presumption of correctness with respect to the trial court's conclusions of law. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26 (Tenn.1996); and Tenn. R.App. P. 13(d). The trial court's factual findings are, however, presumed to be correct and we must affirm such findings absent a preponderance of evidence to the contrary. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87 (Tenn.1993).

Because the trial judge is in a better position to weigh and evaluate the credibility of the witnesses who testify orally, the weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *In re Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn.1997).

## V. ANALYSIS

**Issue 1.**               **Whether the trial court erred in awarding the plaintiff landowners damages only under the mild rule, instead of the harsh rule, where the defendants maliciously trespassed upon the plaintiffs' property to remove topsoil and creek gravel with full knowledge of the plaintiffs' claims.**

**Issue 4.**               **Did the trial court err in failing to determine that the fence line was the correct southern boundary between the Carmack Property and the Earp Property, and if so, should the judgment against Defendant Earp for monetary damages and discretionary costs be vacated?**

The first issues in this appeal concern the boundary between the southernmost edge of the Carmack property and the Earp property. The Earps ask us to find that the trial court erred in failing to find that the fence line along the southern edge of the property constituted the boundary between the Carmack and Earp properties. The Carmacks ask us to find that the trial court erred in awarding damages to the Carmacks under the "mild rule" for trespass damages, instead of under the "harsh rule" that the Carmacks contend was appropriate for the facts of this case.

Voluminous evidence was introduced at trial concerning the boundaries between the Carmack and Earp properties. Most critical was the testimony of the surveyors hired by the parties, Mr. Caldwell and Mr. Carman. Each surveyor was licensed and had many years experience in the surveying business. Each surveyor testified concerning his methods in surveying the properties, from collecting the relevant deeds, plotting the legal description of the property, examining landmarks both artificial and natural, and measuring distances. Both surveyors found mathematical errors in the underlying deed to the Carmack property. They also found that landmarks noted in the underlying deeds were no longer present. Under these circumstances, the surveyors were required to use their judgment in locating the boundary between the Carmack and Earp properties. The trial court stated, in delivering its judgment from the bench: "I find that both Caldwell and Carman are credible witnesses and that both make strong, logical argument." The trial court went on to explain its judgment that the boundary was the line identified by Caldwell, by saying, "I did not find in the deed or the description of the property any reference to the fence line." We conclude that the evidence does not preponderate against the trial court's finding.

We now turn to the question of "harsh" versus "mild" rule damages. The Carmacks state in their appeal brief:

> The primary issue presented in this appeal is whether harsh rule damages should be assessed against trespassers with an ostensibly colorable claim to the subject property, who accelerate their takings of the rightful landowners' crops or minerals when notified of their adverse claim, and who impede the landowners' efforts to have the property surveyed. The trial court implicitly decided this issue in the negative.

-7-

The mild rule charges the defendant with the value of a natural resource (such as timber, rock, or soil) before severance from the earth, and the mild rule is appropriate "where the wrong was innocently done, by mistake or inadvertence." ***Potter v. Tucker***, 688 S.W.2d 833, 836 (Tenn. Ct. App. 1985). The harsh rule charges the defendant with the value of the natural resource after severance. ***Id***. The harsh rule is applied "where the facts show the trespass to have been malicious, or with full knowledge of the title of the injured party, and in willful disregard of his rights." ***Id***.

Appellants contend that our 1985 case of ***Potter v. Tucker***, 688 S.W.2d 833 (Tenn. Ct. App. 1985), in which we addressed the criteria for the application of harsh rule and mild rule damages, supports their claim for harsh rule damages. In their appeal brief, the Carmacks state:

> *Potter v. Tucker* ... provides guidance as to which rule should apply where an adjacent property owner directs the harvesting of his neighbor's crops or minerals when the boundary line between the parties is either unknown or not clearly understood. In *Potter*, the defendant neighbor Tucker caused a large timbering operation to be conducted upon the plaintiff's property without giving the timber cutters guidance as to the location of the boundary line. While there was not a dispute about the plaintiff's deed, the timber cutters apparently were unable to determine where the line was. After the plaintiff was awarded harsh rule damages, Tucker appealed on the basis that the damages awarded were excessive.
>
> The Court of Appeals, however, affirmed. The court found that the size and the magnitude of the trespass upon the plaintiff's land, coupled with Tucker's failure to advise the timber cutters of the location of the boundary line demonstrated a disregard for the plaintiff's rights. In short, Tucker's recklessness subjected the plaintiff to an unreasonable risk of harm from the defendant's timbering operation, which was sufficient material evidence to support the harsh rule award.
>
> The same analysis applies in the present case. Like the defendant neighbor in *Potter*, the Earp defendants knew that the large scale harvesting activities they were directing might be on someone else's land. Indeed, after the Earps were first informally and then formally advised of the existence of a possible conflict, the Earps did not slow or curtail their activities as requested. Instead, the Earps accelerated their encroachments upon the Carmacks' property....
>
> Mr. Earp was openly contemptuous of Mr. Carmack's rights, almost to the point of violence. He did not give the Websters notice of the Carmacks' claims, and, after the Websters learned of the dispute, they were instructed to continue. The Earps and their excavators impeded the progress of the Carmacks' survey by destroying boundary markers and uprooting survey stakes. This is the kind of malicious and willful disregard of another's rights that requires application of the harsh rule.

(Internal citations omitted.) We disagree with the Carmacks' application of ***Potter v. Tucker*** to the facts at bar. As we noted in ***Potter***, the magnitude of the trespass there (75 acres of timber were cut on plaintiff's land) far outstripped the magnitude of the trespass in the case at bar (soil was harvested on less than one acre of the Carmack property). We stated in ***Potter***, "[t]he size and magnitude of the trespass on plaintiff's land ... could indicate a rather reckless abandon on the part of the timber cutters concerning the boundaries." We cannot conclude that a similar "reckless abandon" is apparent here. Furthermore, although we stated in Potter that "the record contains proof the defendants were uncertain as to the location of the boundary line," we also stated:

> There does not appear to be any evidence of uncertainty concerning the deed description to plaintiff's property, but apparently the timber cutters were unable to locate the boundary line. The record contains evidence that the trespass by the timber cutters was caused by Tucker's failure to initially establish or point out the boundary line location. In view of the magnitude of the cutting operation, this failure indicates a disregard for the rights of neighbors when it should have been known that the failure to establish the boundary lines could result in damage to the neighbor's property.

Our decision in ***Potter*** turned upon the fact that a timber-cutting operation of very large magnitude took place without the defendant property owner taking care to establish the boundary line, to the detriment of the plaintiff. In the case at bar, the facts are quite different. The trial court was presented with two surveys, each prepared by surveyors the court found to be credible witnesses. There was reasonable disagreement over the location of the boundary lines, and each surveyor was required to use his professional judgment in locating the boundaries to property despite significant mathematical errors of closure in the relevant deeds. In short, this is a case in which credible expert surveyors disagreed on the location of the boundary between the Earp and Carmack properties. Under such circumstances, the evidence does not preponderate against the trial court's conclusion that Earp's trespass upon the Carmack property was done by mistake or inadvertence.

**Issue 2.** **Whether the trial court erred in failing to apply the plaintiffs' expert's survey to establish (a) the plaintiffs' ownership interest in a railroad right of way acquired by deed; (b) the plaintiffs' western boundary line; and (c) the plaintiffs' southeastern boundary line along Rock Springs Road.**

The Carmacks next contend that the trial court erred in failing to apply the survey of Mr. Caldwell, to establish three boundary lines: their western boundary line (bordered by the Alexander property); the boundary line that runs along the railroad right of way on the south side of the Carmack property; and their southeastern boundary line along Rock Springs Road. We will address each of these three contentions separately.

**A.** **The railroad right of way.**

The Carmacks challenge the trial court's decision to adopt the position of the Earps' surveyor concerning part of an abandoned railroad right of way that was located partially on the Carmack property and partially on the Earps' property. In 1982, the Louisville and Nashville Railroad quitclaimed this right of way back to the predecessors in title of the Carmacks and the Earps. The quitclaim deeds were entered into evidence at trial. As a result of these deeds, the Carmacks now own half of the abandoned right of way to the west of its center line and the Earps own half of the right of way east of its center line, with neither interests subject to the railroad's claim. For the length of this right of way, the center line constitutes the boundary between the Earp and the Carmack properties. At issue in this appeal is only a small fraction of the right of way, the southern end, referred to as a "tip" at trial. Mr. Caldwell, surveyor for the Carmacks, reviewed the quitclaim deeds from the railroad to the predecessors in title of the Carmacks and the Earps, and he concluded that the Carmacks' half of this railroad right of way should extend more than 76 feet below the line establishing the boundary between the Carmack and the Earp properties. When represented on the survey map prepared by Mr. Caldwell, the visual effect is that a small piece of the Carmack property, for a distance of approximately 76 feet and a width of approximately 33 feet, seems to dip below the property line of the Earp property, diagonally in a westward direction. Mr. Earp's surveyor, Mr. Carman, disagreed with Mr. Caldwell's handling of the tip, contending that a proper exercise of surveyor discretion would eliminate the tip. The issue before us, then, is whether the court erred in concluding that Mr. Carman was correct in concluding that surveyor discretion should be used to cut off the railroad right of way so that the "tip" does not dip below the level of the property line between the Earp and Carmack properties. At trial, Mr. Caldwell was asked about the issue of the right of way:

> Q. Now, Mr. Carman testified in an earlier hearing that using surveyor — I think he said surveyor discretion — he eliminated these two tips, from the standpoint of his survey on the Earp property. Is that an appropriate way to survey that property?
> A. Not in my opinion.
> Q. And based on your legal description, are these tips accurately depicted here?
> A. Yes.

Mr. Carman testified as follows:

> Q. Mr. Caldwell testified these two tips show up on the railroad legal description in the deeds?
> A. That's right.
> Q. I think you testified that, yes, they were probably there, but through surveyor discretion you took them out. That's what you testified to before, right?
> A. Yes, sir. I took out those entities, first of all, because they are not fee entities anyway. He is showing them as fee entities. They are not ownership. They were just to clear the title. As a matter of fact, it couldn't be deeded the full fee ownership, the western right-of-way of the railroad, because the only clear document we have establishing that line is the Carmack line, and his fee only comes to the western.

We conclude that the trial court did not err in entering judgment for the Appellees on this issue. The evidence does not preponderate against the trial court's finding that the Earps held the underlying fee interest in the "tip" property, and that therefore the railroad quitclaim deed would not be effective in conveying a fee interest in this property the Carmacks.

## B.     The plaintiffs' western boundary line.

The Carmacks next challenge the trial court's decision that the boundary line between the Alexander and Carmack properties (on the west side of the Carmack property) runs along the fence line to the east of Bledsoe Creek. The Alexanders urge us to uphold the trial court's decision. The Carmacks state in their appeal brief:

> [T]he court deviated from the survey prepared by the plaintiffs' expert Dewayne Caldwell by ... altering the boundary between the Carmacks' and Phillip Alexander to run along a fence on the west bank of Bledsoe Creek....

> [T]he trial court apparently did not take into consideration the Carmacks' acquisitions of the 1.0 and 1.1 acre tracts through the deeds conveyed by the Alexanders in 2000.

The Alexanders contend that the boundary does run along the fence line to the east of Bledsoe Creek. In their appeal brief, they state:

> [T]he trial court was indeed correct, both legally and factually, when it held that the proper and just boundary line between Alexander and the Plaintiff was the old fence that ran along the western edge of Bledsoe Creek. The law in Tennessee is well settled in determining a boundary line dispute 'the court must look first to the natural objects or landmarks on the property, then to the artificial objects or landmarks on the property, then to the boundary lines of adjacent pieces of property, and finally to courses and distances contained in documents relevant to the disputed property.'

The survey conducted by the Carmacks' surveyor, Mr. Caldwell, showed the boundary running along the west side of Bledsoe Creek, with the Carmack property including a strip of land on the west side of the creek near Alexander Road. The survey by Mr. Carman, the Earps' surveyor, showed the boundary between the Carmack and Alexander properties as running very close to the boundary found by Mr. Caldwell, with minor deviations. The most notable disparity between the two surveys is that Mr. Carman's survey did not include the strip of land on the west side of the creek near Alexander Road, in the Carmack property.

Rejecting the conclusions of both Mr. Caldwell and Mr. Carman as to the western boundary of the Carmack property, Mr. Alexander's attorney Mr. Hunter sought to show that the most sensible way to resolve the competing surveys was for the court to find that the fence line to the west of Bledsoe Creek was the property line. Upon cross-examination by Mr. Hunter, Mr. Caldwell testified

that the fence was "very old." Mr. Carmack, upon cross-examination by Mr. Hunter, acknowledged that he had never worked on the disputed strip of land on the west side of the creek, but he stated that he thought his predecessors in title may have worked on it. Mr. Carmack also acknowledged that the strip of land could only be accessed by fording the creek or going through Phillip Alexander's property. Brenda Carmack Thomas testified that Phillip Alexander, or his predecessors in title, had used the strip of land as a trash dump, and that she desired to get possession of this property so she could clean it up. Phillip Alexander testified that, when he brought his property to the east of the Carmack property, he believed the property line to follow the fence line. Carroll Carman testified that, in the deed to the Phillip Alexander property (which he surveyed in addition to the Earp property), there were mathematical diparities is "hundreds of feet." Finally, Glenn Carter, a 69-year old man who was born and raised in Bethpage, testified that he remembered a fence being present along the east side of Bledsoe Creek when he was ten years old.

The Carmacks also ask us to consider whether the conveyance of two tracts, one that is 1.1 acres in size and another that is 1 acre in size, from the Alexanders to the Carmacks calls into question the trial court's finding that the property line runs along the fence line to the west of Bledsoe Creek. These two small parcels were initially sold to the Alexanders, in fee simple, by Bertha Cox and Rosalie Cox Carmack in April and May of 1958, during the time when the Alexanders already held a life estate in the Carmack property. In 2000, at the same time that the Alexanders surrendered the life estate in the Carmack property, they also conveyed the 1.1 acre plot and the 1 acre plot to the Carmacks.

Having reviewed the testimony taken and evidence adduced at trial, we conclude that the evidence does not preponderate against the trial court's finding that the western boundary line runs along the fence line west of Bledsoe Creek. Given the significant mathematical disparities in the deeds to both the Phillip Alexander property and the Carmack property, and the testimony concerning the fence line as a long-established boundary between the two properties, the problem of establishing the boundary between the Carmack and Alexander properties did not admit of an easy solution; but the evidence introduced by the parties amply supports the trial court's decision. Also, the fact that the Alexanders conveyed the 1.1-acre and 1-acre plots was appropriately considered in the trial court's judgment and does not change our conclusion. We find no error.

## C.     The plaintiffs' southeastern boundary line along Rock Springs Road.

The Carmacks next argue that the trial court erred in its judgment as to the location of the boundary between the Carmack and Earp properties in the proximity of Rock Springs Road. The Carmacks contend that part of Rock Springs Road was moved at some point in the last several decades, and that therefore, part of the boundary line identified by an early deed as "the center of Rock Springs Road" actually lies upon property claimed by the Earps. A significant amount of testimony and other evidence was introduced at trial, both in support of and against the Carmacks' assertion that Rock Springs Road had moved. We will briefly summarize this testimony.

Mr. Caldwell, the surveyor for the Carmacks, produced a 1955 U.S. Geological Survey map suggesting that Rock Springs Road was located to the west of its current location. The map showed no name for the road, and indicated that the road was "light-duty." Mr. Caldwell testified that the road in its earlier location appeared to sit on what was Lot 25 of the Earp's residential development. Mr. Caldwell also testified that part of Lot 21 was also Carmack property. He stated that approximately ten feet of the roadway was on Lot 21. Mr. Caldwell testified that it was still possible to drive on the old roadway, but he was uncertain whether it was a publicly dedicated road.

Jerry Carmack testified that he recalled that Rock Springs Road was in a different location in his boyhood. He testified that he had travelled along the old road with his grandmother and had used it himself over the years. He stated that when the road ran in its earlier location, it was necessary to ford Bledsoe Creek. He also stated that he remembered the mailman using the old road; he recalled being given a ride along the road by the mailman as a boy. He identified several pieces of evidence that, in his view, established that Rock Springs Road had been moved: he identified the old road in a photograph; he showed the old location of the road on an official Sumner County road name map; a photograph of his grandmother that, he contended, showed the location of the old Rock Springs Road; and a NRCS survey map showing the location of an old road.

Erwin McKee, a long-time resident of the area who lives near the Carmack property, testified that Rock Springs Road had moved, and that he remembered motor vehicles and farm equipment using the road in its old location. Roger Leath, another long-time resident of Bethpage, also recalled Rock Springs Road being located in a different place, and testified that he remembered riding his bicycle along the old route when he was a child. The old Rock Springs Road, Mr. Leath testified, was used by "everybody," and he stated that "it was the only way anybody could get in and out." Brenda Carmack Thomas also testified that she remembered the old location of the road, and had a vivid memory of speeding along the road, and through Bledsoe Creek, in a car driven by her father. Carroll Carman, surveyor for the Earps, acknowledged that there appeared to be an old road visible in aerial photos taken by a soil conservation agency, but he was not willing to affirm that this was Rock Springs Road. He stated, "I can't see anything certain about an old roadway, period, because I've never seen an old roadway. You can drive out Rock Springs Road, and there is no old roadway there; only Rock Springs Road."

We conclude that the trial court did not err in finding that the boundary line of the Carmack property is represented by the current location of Rock Springs Road. Although the Carmacks brought forth a great deal of testimony and other evidence concerning the existence of *a* road to the east of the present Rock Springs Road, this evidence was inconclusive as to whether the old road was actually Rock Springs Road. It was unclear whether the old road, recalled by several witnesses from their childhood, was actually a publicly dedicated road. In light of this ambiguity, we conclude that the evidence does not preponderate against the trial court's judgment that the boundary in question is set by the present location of Rock Springs Road, not the old road.

**3.**      **Whether the trial court erred in granting the defendant Castalian Springs-Bethpage Water Utility District of Sumner County [Summary Judgment] where the plaintiff had raised by affidavit genuine issues of material fact.**

The Carmacks next ask us to reverse the trial court's grant of summary judgment to the defendant, Castilian Springs-Bethpage Water Utility District (CSBUD). In the Verified Complaint, the Carmacks alleged that CSBUD committed a taking of their property without payment of just compensation

> by, among others, causing approximately four (4) water meters and other water facilities to be placed upon Plaintiffs' property and destroying a historic rock fence on Plaintiffs' property which was a boundary marker and causing other damage.

The Carmacks contend that, in an affidavit filed as an exhibit to the plaintiffs' response to CSBUD's statement of material undisputed facts, and which they relied upon in response to the motion for summary judgment of CSBUD, they raised genuine issues of material fact, and that therefore the trial court erred in its grant of summary judgment. In their appeal brief, the Carmacks state:

> The defendant water utility district presented a clear and cogent argument for dismissal. It relied upon the one year statute of limitations set forth in T.C.A. 29-16-124 [for inverse condemnation actions] and produced an affidavit attesting to the fact that Castalian Springs had not conducted installation work on the plaintiffs' property since 1994. The court accepted this argument.

> The defendant's case, however, was rebutted for Rule 56 purposes by the opposing affidavit of Mr. Carmack. Mr. Carmack provided competent evidence that Castalian Springs had been on the east side of the Carmacks' Rock Springs Road frontage as late as the spring or summer of 2001, and that the utility had dug and connected a water meter, damaged survey stakes and left without re-grading or re-seeding the property. Accordingly, a genuine issue of material fact was created and summary judgment was inappropriately granted.

In support of the Water Utility District's motion for summary judgment, Bobby Linville, manager of CSBUD, stated in an affidavit dated April 23, 2003:

> ... I have personal knowledge of the fact that the last construction that was done on or near the Plaintiffs' property which is the subject of the above-captioned lawsuit, was done in 1994 when a six-inch water line was laid on the west side of Rock Springs Road which is one of the main lines for CSBUD between Castalian Springs and Bethpage. Said six-inch water line was laid on what was believed to be the county right-of-way except for a portion that was laid on the Carolyn McKee Payne property.... I have no knowledge of how the damage to the rock fence occurred that is alleged in Plaintiffs' complaint but can state that it was not done in connection with the 1994 installation of CSBUD's six-inch water line.

In the affidavit filed as an exhibit to the plaintiffs' response to CSBUD's statement of material undisputed facts, Appellant Jerry Carmack stated:

> 3.    I have personal knowledge that in approximately October or November 1998, Castalian Springs installed a water meter on the Plaintiffs' property in the vicinity of Lot 22 McKee Farm Estates.
>
> 4.    I have personal knowledge that in approximately December 1999 [or] January of 2000, Castalian Springs installed a water meter on the Plaintiffs' property in the vicinity of Lot 18 McKee Farm Estates.
> 5.    I have personal knowledge that in approximately November 2000, Castalian Springs installed a water meter on the Plaintiffs' property in the vicinity of Lot 20 McKee Farm Estates.
>
> 6.    I have personal knowledge that in approximately April 2001 through June 2001, Castalian Springs connected a water meter on the Plaintiffs' property on the east side of Rock Springs Road directly across from Lot 18 McKee Farm Estates to provide water to the Barnes and Soprano properties from the six inch water supply line. Also, in the process of this construction Castalian Springs damaged survey stakes, left debris and huge boulders and did not grade and re-seed the disturbed area.
>
> 7.    I have personal knowledge that in June of 2001, Castalian Springs in the process of abandoning the three-inch water line, entered upon Plaintiffs' property and tunneled and excavated both sides of Rock Springs Road to connect the water meter on the Plaintiffs' property to the six-inch water line. Castalian Springs did not re-grade or re-seed the disturbed areas on Plaintiffs' property.

The Tennessee law on the appropriate standard for granting summary judgment is explained thoroughly by the Tennessee Supreme Court in the case of *Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993). In *Byrd v. Hall*, the appellant had sued three individuals for tortious interference with employment. The trial court granted summary judgment to these persons. On appeal, the Tennessee Supreme Court explained that it

> granted the Plaintiff's Rule 11 application in order to establish a clearer and more coherent summary judgment jurisprudence in view of the increased use of Rule 56 as a vehicle designed to implement the objectives of the Rules of Civil Procedure—the just, speedy, and inexpensive resolution of litigation.

*Id*. at 209.

As explained by the Supreme Court, "the summary judgment process is designed to provide a quick, inexpensive means of concluding cases, in whole or in part, upon issues as to which there is no genuine dispute regarding material facts." *Id*. at 210. "[A] motion for summary judgment goes

directly to the merits of the litigation, and a party faced with such a motion may neither ignore it nor treat it lightly. This is particularly true since summary judgment is not a disfavored procedural shortcut but rather an important vehicle for concluding cases that can and should be resolved on legal issues alone." *Id*. (internal citations omitted). The Tennessee Supreme Court set forth three issues it deemed to be "at the heart of evaluating a summary judgment motion:"

(1) Whether a factual dispute exists: "[W]hen there is no dispute over the evidence establishing the facts that control the application of a rule of law, summary judgment is an appropriate means of deciding that issue." *Id*. at 214-5.

(2) Whether the disputed fact is material: "A disputed fact is material if it must be decided in order to resolve the substantive claim or defense at which the motion is directed." *Id*. at 215.

(3) Whether the disputed fact creates a genuine issue for trial: "[T]he test for a 'genuine issue' is whether a reasonable jury could legitimately resolve that fact in favor of one side or the other. If the answer is yes, summary judgment is inappropriate; if the answer is no, summary judgment is proper as there would be nothing for the jury to do ...." *Id*.

The burden rests upon the moving party to make a properly supported motion demonstrating that there are no disputed, material facts creating a genuine issue for trial. *Id*. The question before us, then, is whether the Carmacks raised a disputed question of material fact, creating a genuine issue for trial. Upon reviewing the affidavits filed by both CSBUD and the Carmacks, we conclude that the trial court erred in granting summary judgment to CSBUD. In their Verified Complaint, the Carmacks contended that CSBUD had committed a taking of their land without just compensation by installing four water meters and other water facilities on the Carmack property. CSBUD sought summary judgment on the basis that it had not done any installation on or near the Carmack property since 1994. Although some of the allegations in Jerry Carmack's affidavit concern parcels on the west side of Rock Springs Road, determined by the trial court to be Earp property, Carmack's affidavit also alleges that CSBUD trespassed on the east side of Rock Springs Road. This is denied by CSBUD, in its own affidavit. Not only is this a disputed fact; it is also a material fact, since the Carmacks' cause of action turns upon whether CSBUD worked on their property within the time covered by the statute of limitations. The actions of which the Carmacks complain took place as late as June 2001; the Carmacks filed their Verified Complaint on June 7, 2001, which would be well within the statute of limitations. We conclude that a reasonable jury could legitimately resolve this issue in favor of one side or the other. For these reasons, we conclude that the trial court erred in granting summary judgment to CSBUD.

5.      **Whether the trial court erred by ordering Defendant Earp to restore the Plaintiffs' access to their property from Rock Springs Road in the absence of any proof that the Defendant had prevented such access?**

The final issue on appeal concerns the trial court's judgment requireing the Earps to restore the Carmacks' access to their property from Rock Springs Road. In its judgment, the trial court

stated: "Defendants Earp are hereby required to repair, restore and make available, at said Defendants' expense, the Plaintiffs' access to Plaintiffs' property from Rock Springs Road." The Earps contend that the trial court erred in ordering the Earps to restore access to the property, when in fact the trial court did not find that the Earps had made access to the Carmack property impossible. In their appeal brief, the Earps state, "Such a vague ruling seems likely to result in further litigation in the future concerning whether or not the entrance was restored to the Plaintiffs' satisfaction."

Upon reviewing the relevant filings and orders in this case, we conclude that the trial court did not err in ordering that the Earps "repair, restore and make available, at [the Earps'] expense, the Plaintiffs' access to Plaintiffs' property from Rock Springs Road." At the outset of proceedings at the trial level, the trial court entered an order of temporary injunction stating, in relevant part:

> Defendants Ken H. Earp and Tina M. Earp, their contractors, agents, servants, employees, representative[s] and any and all persons in active concert or participation with them are enjoined, that is prohibited, from blocking plaintiffs' ingress and egress to their real property using what they contend to be an old county road or using the old railroad right-of-way.

In the transcript of the trial court proceedings, the court delivered the judgment from the bench. The trial court stated:

> There is one other issue, and that is the issue relative to ingress and egress from Rock Springs Road into the property of the Carmacks. We made sure that this was left open for the Carmacks during the pending of this case, but the Court is of the opinion that they still have access. If that access was in any way damaged or disturbed by Earp, Earp can look to that to restore so that they have access from Rock Springs Road into their property to the left of Rock Springs Road.

We conclude that the trial court did not err in requiring the Earps to "repair, restore and make available" the Carmacks' access to their property. The trial court's statement that it "is of the opinion that they still have access," seems to pertain to the access that was protected by the temporary injunction; the trial court's order in the final judgment was designed to ensure that the Carmacks continue to have access to their property from Rock Springs Road. From the copious evidence introduced at trial, there does appear to be a danger that, absent some court order guaranteeing access, that development on Lot 25 of the Earp property could block access by destroying the "old road" that runs in the vicinity of Rock Springs Road onto the Carmack property. Therefore, we conclude that the trial court did not err in including this requirement in its final judgment in this matter.

## VI. CONCLUSION

For all the foregoing reasons, we vacate the trial court's grant of summary judgment to Castalian Springs-Bethpage Water Utility District. In all other respects, the trial court's judgment

is affirmed. Costs in this appeal are assessed against the Appellants, Jerry Dale Carmack, Georgia Kay Carmack Brooks, and Brenda Gail Carmack Thomas, and their surety.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.